1

AG:MPR/KDE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

CARLOS ALMONTE VASQUEZ,
TODD MACALUSO and
HUMBERTO OSUNA CONTRERAS,
also known as "Mateo,"

Defendants.

- - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANTS

(21 U.S.C. §§ 959(c)(2), 959(d),
960(b)(1)(B)(ii) and 963)

16-M-1021

EASTERN DISTRICT OF NEW YORK, SS:

ALEXANDER SOSA being first duly sworn, deposes and states that he is a Task Force Officer with the Drug Enforcement Administration duly appointed according to law and acting as such.

On or about and between October 25, 2016 and November 14, 2016, both dates being approximately and inclusive, within the Eastern District of New York and elsewhere, the defendants CARLOS ALMONTE VASQUEZ, TODD MACALUSO and HUMBERTO OSUNA CONTRERAS, also known as "Mateo," (together, "the defendants"), did knowingly and intentionally conspire to possess a controlled substance with intent to distribute on board an aircraft registered in the United States, which offense involved a substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code Section 959(c)(2). The amount of cocaine involved in the conspiracy

attributable to the defendants as a result of their conduct, and the conduct of other conspirators reasonably foreseeable to them, was at least five kilograms or more of a substance containing cocaine.

(Title 21, United States Code, Sections 959(c)(2), 959(d), 960(b)(1)(B)(ii) and 963.)

The source of your deponent's information and the grounds for his belief are as follows:

1. I have been a Task Force Officer with the Drug Enforcement Administration ("DEA") for approximately five months and have been employed by the New York City Police Department ("NYPD") for approximately 14 years. I am currently assigned to the Drug Enforcement Task Force, where I investigate international narcotics conspiracies, related firearms offenses and other crimes. These investigations are conducted both overtly and covertly. During my tenure with the DEA and NYPD, I have participated in numerous investigations of narcotics conspiracies, during which I have (a) conducted physical surveillance, (b) executed search warrants, (c) debriefed cooperating witnesses, (d) reviewed and analyzed numerous taped and monitored wiretapped and conversations and (e) reviewed line sheets prepared by wiretap monitors. Through my training, education and experience, I have become familiar with the manner in which narcotics conspiracies and other crimes are carried out, and the efforts of persons involved in such activity to avoid detection by law enforcement.

2. I am familiar with the facts and circumstances of this investigation from, among other sources, my discussions with special agents of the Federal Bureau of Investigation, the Drug Enforcement Administration and foreign law enforcement officers, as

well as from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another agent or law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. Based on my training and experience, I have become familiar with how drug trafficking organizations ("DTOs") smuggle narcotics, specifically cocaine, into the United States. Among other methods and means, DTOs routinely use aircraft registered in the United States to pick up narcotics in source countries in South America. The DTOs often prefer to use aircraft registered in the United States because of the believe that such aircraft will be subject to less scrutiny in foreign countries and their federal aviation authorities. After the aircraft picks up the narcotics in the source or surrounding country, DTOs often direct the plane to fly to a transshipment point, often in Central America. From there, the DTOs use many methods and means to smuggle the narcotics into the United States through Mexico, often times to the Eastern District of New York.

4. Based upon my participation in the investigation, review of electronic records, discussion with other law enforcement agents and review of reports, I know that beginning in approximately October 2016, members of DTO were seeking to use an aircraft that would fly from Haiti to Ecuador, pick up cocaine, and then transport it to Honduras to subsequently be imported into the United States.

5. Specifically, on or about October 25, 2016, a co-conspirator member of a DTO ("CC-1") discussed in lawfully intercepted communications the plan to use an aircraft to transport cocaine. Among other things, CC-1 stated that CC-1's partner, the defendant CARLOS ALMONTE VASQUEZ, would travel to Haiti to inspect the plane and arrange for its travel in anticipation of the plane being used to travel to Ecuador to pick up cocaine.

6. On or about October 26, 2016, the defendant CARLOS ALMONTE VASQUEZ, while in Port-au-Prince, stated during a lawfully recorded meeting that the aircraft would be used to transport between approximately 1,500 and 1,800 kilograms of cocaine. During the meeting, ALMONTE VASQUEZ also confirmed he was a partner of CC-1.

7. The next day, on or about October 27, 2016, the defendant CARLOS ALMONTE VASQUEZ, while still in Port-au-Prince, discussed during a lawfully recorded meeting using other aircraft to transport the narcotics, including a Gulfstream II ("G2") plane. A few days later, on or about November 2, 2016, CC-1 stated during a lawfully intercepted conversation that a G2 aircraft was traveling from Florida to Haiti and was available to transport the cocaine. This aircraft, however, was unable to leave the United States.

8. Thereafter, members of the DTO sought to secure another aircraft that could move cocaine from Ecuador to Honduras for eventual importation into the United States. After numerous attempts, on or about November 13, 2016, CC-1 stated during a lawfully intercepted communication that the DTO would use a Falcon 10 aircraft, which had tail number N720DF and was registered in the United States ("Subject Aircraft"). CC-1

stated that the pilot of the Subject Aircraft would be the defendant TODD MACALUSO.[1] CC-1 also advised that a crew member known as "Mateo," and later identified as the defendant HUMBERTO OSUNA CONTRERAS, would be flying aboard the Subject Aircraft and would represent the investors who were to purchase a portion of the cocaine.

9. On or about November 13, 2016, in lawfully intercepted electronic communications, the defendant CARLOS ALMONTE VASQUEZ stated that he would be present in Haiti on November 14, 2016. The defendant ALMONTE VASQUEZ also confirmed that the "chauffer" would also be arriving and that the "captain" knew "everything" (but that the co-pilot did not). Based upon my training and experience, I believe that the term "chauffer" and "captain" refer to the pilot of the plane and that the defendant ALMONTE VASQUEZ meant that the pilot (but not the co-pilot) was aware that the aircraft would be used to transport cocaine.

10. Based upon my discussions with law enforcement officers, review of flight records and other involvement in the investigation, I know that on or about November 13, 2016, the Subject Aircraft flew from Orlando, Florida to Port-au-Prince, Haiti. The defendant TODD MACALUSO was the pilot of the Subject Aircraft and the defendant HUMBERTO OSUNA CONTRERAS was also on board.

11. On or about November 14, 2014, while in Port-au-Prince, the defendants CARLOS ALMONTE VASQUEZ, TODD MACALUSO and HUMBERTO OSUNA CONTRERAS and others met to discuss the plan to use the Subject Aircraft to transport cocaine from Ecuador for further distribution. During this meeting, which was

---

[1] In addition, in a lawfully intercepted e-mail, CC-1 attached copies of a passport, pilot's license and medical certification for the defendant TODD MACALUSO.

lawfully recorded, the defendants, among other things, agreed to receive over $150,000 for transporting the cocaine on the Subject Aircraft, including $35,000 in Haiti plus an additional $150,000 at a later time, a portion of which the defendant OSUNA CONTRERAS agreed to receive in New York. Moreover, the defendant MACALUSO described, in the presence of both ALMONTE VASQUEZ and OSUNA CONTRERAS, the structure of the Subject Aircraft, stating that it could hold 1,500 kilograms of cocaine.

12. After the meeting, on or about November 14, 2016, Haitian law enforcement officers placed the defendants under arrest for violations of Haitian law. The defendants are expected to be expelled from Haiti and first arrive in the United States at John F. Kennedy International Airport in Queens, New York.

WHEREFORE, your deponent respectfully requests that the defendants CARLOS ALMONTE VASQUEZ, TODD MACALUSO and HUMBERTO OSUNA CONTRERAS, also known as "Mateo," be dealt with according to law and that warrants be

issued for their arrest. Furthermore, I respectfully request that this affidavit and any arrest warrants be filed under seal.

Det. _____ 2549
ALEXANDER SOSA
Task Force Officer
Drug Enforcement Administration

Sworn to before me this
16th th day of November, 2016

_____
THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK