Michael H. Gold
350 Fifth Avenue, Suite 6800
New York, New York
10118
Tel (212) 838-0699
Fax (212) 868-0013

April 23, 2018

`
_
Honorable I. Leo Glasser
United States District Court
United States District Judge
225 Cadman Plaza East
Brooklyn New York 11201

Re: *United States v. Todd Macaluso, 16 CR. 609, (ILG)*

Dear Judge Glasser:

    I am writing on behalf of my client, Todd Macaluso, regarding his sentence on May 3, 2018. While the defendant was convicted after trial, the same sentencing factors obtain as if he had entered a plea of guilty. We urge the Court to impose a sentence outside the cited guideline range in the pre-sentence report and reject its recommendation of a 30 years to life sentence that is grotesquely disproportionate to other sentences we believe will be imposed and contrary to the needs of sentencing.

    In reaching an appropriate decision at sentencing, the Court must be guided by the facts and circumstances of the particular case. Under *United States v. Booker*, 125 S. Ct. 738 (2005), this Court is no longer bound by the federal sentencing guidelines but must, instead, consider the applicable guideline range as but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 128 S.Ct. 554, 574 (2007). The guidelines are only the "starting point and initial benchmark.." *Id., citing Gall v. United States*, 128 S.Ct.586, 596 (2007). It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id.*, *Kimbrough*, 128 S.Ct.at 574, citing *Gall,* 128 S.Ct. at 597. The Court may not simply presume that the guideline range is reasonable. *Gall,* at

597. Rather, the Court must make an individualized assessment based on the facts presented.

From its unique vantage point, the Court may conclude that, despite the guidelines, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing . . ." *Kimbrough.*, 128 S.Ct. at 570, *citing* 18 U.S.C. § 3553(a). The not "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense*."* 18 U.S.C. § 3553(a). Indeed, as the Supreme Court suggested in *Gall*, a sentence of imprisonment may not promote respect for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, 128 S.Ct. at 599.

The factors weighing into the imposition of a reasonable sentence include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for--
        (A) the applicable category of offense committed by the
        applicable category of defendant as set forth in the
        guidelines... ;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

Weighing all the sentencing factors, a sentence of 30 years to life is inappropriate and "greater than necessary".  Mr. Macaluso put the government to its proof and, therefore, disputes the factual allegations contained in the PSR. As well, we seek a *Fatico*

hearing regarding the amounts of narcotics attributable to the defendant. The PSR alleges drug conspiracy of at least 1500 kilograms of cocaine without adequate factual support or explanation and we respectfully object to that total. Attribution of these amounts is fatally flawed without a jury finding and the guideline calculation should be limited to the charged amounts in the indictment.

All nine justices in *Booker* agreed that, at least as to elements of crimes of which the defendant is accused, the jury must confirm the truth of every accusation. *543 U.S. at 239; id. at 327-28 (Rehnquist, C.J., dissenting)*. Indeed, the Framers could not have intended to guard against governmental oppression through criminal juries with ultimate power to confirm or reject the truth of every accusation, to acquit even in the face of guilt, and to partially acquit to lessen unduly harsh punishment, only to allow an administrative agency, prosecutor and judge to then nullify the jury's acquittal. Doing so eviscerates the "fundamental reservation of power" in the jury and prevents it from "exercis[ing] the control that the Framers intended." *Blakely, 542 U.S. at 306*. And doing so by ignoring the "[e]qually well founded ...companion right to ... proof beyond a reasonable doubt" is no answer. *Apprendi, 530 U.S. at 478*. Like other "'inroads upon the sacred bulwark of the nation," the logical possibility that different standards of proof applied by jury and judge might produce different results is "fundamentally opposite to the spirit of our constitution.'" *Booker, 543 U.S. at 244, quoting 4 Blackstone 343-44*.

The Sixth Amendment guarantees a sentence that is wholly authorized by the jury verdict. *See Cunningham v. California, 127 S. Ct. 856, 869 (2007)* ("If the jury's verdict alone does not authorize the sentence . . . the Sixth Amendment requirement is not satisfied."); *Blakely, 542 U.S. at 306* (*Apprendi* "ensures that the judge's authority to sentence derives wholly from the jury's verdict"); *Apprendi, 530 U.S. at 483 n.10* ("The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury.").

The jury was never asked to provide a determination of drug amounts other than the bare minimums contained in the indictment. The PSR finding of 1500 kilograms of cocaine vastly exceeds that amount and, therefore, without jury endorsement cannot be maintained.

As well, application of the guidelines will result in a grossly enhanced period of incarceration compared to his co-defendants and the Court is empowered to consider that potential disparity in fashioning the appropriate sentence for Mr. Macaluso. *See United States v. De La Cruz, No.09-4641-cr, 2010 WL 4136669 (2d Cir. Oct. 21. 2010);United States v. Ebbers, 458 F3d. 110 (2d. Cir. 2006).* District courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and we may remand cases where a defendant credibly argues that the disparity in sentences has no stated or apparent explanation. *See United States v. McGee,* 408 F.3d 966, 988 (7th Cir.2005) (remanding for reconsideration of sentencing disparities between equally culpable codefendants.

Concededly, the charges and circumstances are different between Mr. Macaluso and his cooperating co-defendants. Obviously, they each testified pursuant to a cooperation agreement and deserve to reap a benefit therefrom. However, the time deducted from their sentences should not be added to Mr. Macaluso's. That they receive sentences in the area of 5 or 10 years or perhaps less while Mr. Macaluso gets 30 years or more is incompatible with any sense of constitutionally mandated proportion.

Cooperation is obviously a cornerstone of many if not most prosecutions. The government is certainly free to enter agreements to advance their perceived interests. However, when individuals, such as Messrs. Almonte and Contreras, who 1) held significantly higher positions within the drug organization, 2) over a substantial period of time, and, 3) arranged many and massively more drug deals, are given deals to testify against lesser figures, something is askew in the calculi. This is the sort of prosecutorial manipulation of the charging process that contributed to the *Booker* decision making the guidelines advisory. Can it truly be said that the community at large is better situated with Mr. Contreras and Mr. Almonte walking the streets than Mr. Macaluso? Yet, they will be free after serving lengthy, but comparatively brief, sentences relative to those currently faced by Mr. Macaluso.

Mr. Macaluso, who is 55 years old, was born in Oyster Bay, New York. Growing up, he lived with his parents Joan (86 years old) and Theodore (deceased), his older brother Glenn (deceased) and his little sister Stacey (51 years old).  His father worked in the garment business in Manhattan and his mother was a stay at home mom. Todd and his

siblings all were educated by Jesuits from early childhood all the way through to graduate school.  From their Jesuit education, they learned the missionary spirit, community and discipline.

Mr. Macaluso's parents divorced after he and his siblings left home.  The entire family, however, remained close, and, in fact, within a span of a few years all relocated to California. He worked as a market researcher while attending Boston College so he could pay for flying lessons. His love of flight soon evolved into a passion for flight design and engineering.

After graduating from University of Detroit School of Law, Mr. Macaluso moved to be close to his extended family in Southern California where he began his practice at Wilson, Elser, Moskowitz, Edelman & Dicker and within a short period of time, he was managing the firm's aviation division and defended airlines and aircraft manufacturers in civil litigation matters. Mr. Macaluso's nature was always more in line with looking out for the little guy and so early on in his career he switched from defense to plaintiff representation.

In 1996, he switched from aviation defense to plaintiff's personal injury litigation. He and his brother, Glenn, became partners and made an excellent litigating team, complimenting each other's skillsets and style.  Mr. Macaluso was the extroverted, "big picture" lawyer and his older brother Glenn was the softer spoken, practical, "details" man. Within a few years, Mr. Macaluso's sister, Stacy Macaluso Diaz, also joined her brothers and worked part time as an attorney for the firm while she raised her two young children in Carlsbad, California.

In the twelve years that followed, Mr. Macaluso along with his partners settled dozens of personal injury cases reaping jury awards and settlement totaling well over a $100 million dollars.

At the end of 2006, his brother, law partner and best friend, Glenn, died unexpectedly.  Not having ever married, Glenn was his mother's closest companion and dinner mate. After his untimely death, she fell into a profound depression. Mr. Macaluso similarly was overwrought with depression and became overwhelmed with the continuing demands of his busy law practice as well as taking care of his family and mother.

Mr. Macaluso and his brother Glenn had always shared the financial responsibilities of supporting their mother (86 yrs.) since the early 1990's. Once Glenn died, Mr. Macaluso became her sole means of financial support. Mr. Macaluso also provided a more limited amount of financial support for his father and step mother (71 years) to help them meet their living expenses.

Mr. Macaluso is married and has two children, his son, Aidan (12) and a daughter, Capri (4 years old). He shares custody of Aidan with his former wife, and the two are extremely close. As father and son, they spent a lot of time fishing, cooking, hiking, and tent camping at Gordon Wells, where they ride dune buggies. Tonya, his wife, is a stay-at-home mom, and raises their daughter, Capri and step-son, Aidan. She remains a great source of support and encouragement to her husband.

A lifetime of Jesuit education instilled in Mr. Macaluso a desire to serve those in need in his community as well as other countries suffering from natural disasters. He has used his talents as a pilot, an organizer, a communicator and a lawyer of means to help others.

As a lawyer, Mr. Macaluso donated his time to speak to aspiring lawyers on trial advocacy, complex civil litigation evidence and civil appeals and writs. As a member of the community, he has donated money to the Christian Faith Deliverance Church of San Diego enabling a number of the bishops to pay for travel for an audience with Pope Francis. In 2010, Todd put his previously firm owned Pilates PC-12 plane to use (with its short-field landing capacity) providing disaster relief within days of the Haitian Earthquake. He transported medical equipment, doctors and x-ray machines to Haiti and returned to West Palm Beach carrying adult and children amputees to West Palm Beach Hospital. For one week Todd donated his own time and skill as a pilot and organized other pilots to use his plane for an additional two weeks.  He paid for all the fuel and accommodations for the group he sent to Haiti. He has used his plane and helicopter to airdrop medical supplies, food and water to provide relief to stranded villagers in the remote areas of Baja after devastating hurricanes in 2006, 2009, 2012 and 2014.

Locally, Mr. Macaluso has worked with the San Diego Auxiliary to raise funds that went to building the children's cancer wing for San Diego Children's Hospital,

and also donated $60,000 to Kendall Farms Produce to help install three water wells, which are used to water, grow and cultivate fruits and vegetables for the impoverished who reside in the Fallbrook and north county area.

Mr. Macaluso has been recognized for his significant contributions to his Community. In 2007, he received the prestigious President Maureen A. Fay, O.P., Public Service Award which is bestowed each year upon an alumnus who exemplifies the commitment to service and dedication to the community that characterized Sister Fay's tenure at UDM.

Mr. Macaluso is 55 years old. He has made many mistakes in his life and has been incarcerated before. At the same time, he was deeply dedicated to improving the lives of the impoverished, suffering and sick. Simply put, incarcerating him for the rest of his life serves no useful purpose.

For the foregoing reasons, we respectfully request that the recommendations and guideline calculations in the PSR be rejected by the Court and a sentence imposed that is reasonable and warranted as compared to his co-defendants.

Respectfully submitted,

Michael H. Gold